ELEANOR M. LACKMAN (SBN 298594)
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone:  (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Prism Data Technologies, Inc.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRISM DATA TECHNOLOGIES, INC., | CASE NO. **'24 CV 2300 RSH MMP** |
| Plaintiff, | **COMPLAINT** |
| v. | **Demand for Jury Trial** |
| TOMOCREDIT, INC., | |
| Defendant. | |

Mitchell
Silberberg &
Knupp LLP

20368220.1

**COMPLAINT**

Plaintiff Prism Data Technologies, Inc. ("Prism"), for its complaint against defendant TomoCredit, Inc. ("Tomo"), pleads the following:

## PRELIMINARY STATEMENT

1.      This case concerns the willful and persistent infringement by Tomo, a financial technology enterprise seeking to compete with Prism, of the federally registered name of Prism's flagship product: the solution marketed under the name CashScore® (the "Mark"), which Prism coined.

2.      Prism's CashScore® product is a market-leading "cash flow underwriting" solution that Prism has offered broadly to financial service providers for years, to help them predict the probability of consumer and small business credit default based on deposit account activity.

3.      In March 2024, Tomo announced a new product called the TomoScore, which appears to be an attempted copy of Prism's CashScore® product, aimed at the same customers, to address the same business need.  In connection with marketing the TomoScore, Tomo is actively usurping Prism's rights in the Mark, including by using the Mark itself.

4.      When Prism confronted Tomo about this infringement, Tomo refused to cease and desist and made erroneous claims regarding its rights to use the term.  In support of its erroneous claims, Tomo *fabricated evidence* of purported use of the term prior to Prism, but Prism rapidly identified Tomo's attempted fraud.

5.      Despite Prism's efforts to resolve this matter amicably, Tomo continues to usurp Prism's federally registered rights in the Mark.  Upon information and belief, Tomo is infringing the Mark both to confuse the public and potential customers and to capitalize on the considerable investments Prism has made, and the brand equity Prism has built, in the Mark.

6.      In addition to Tomo's transparent efforts to use unfair methods to steal business from Prism, the risk of confusion here is significantly exacerbated by Tomo's deeply negative reputation in the financial services marketplace.  Tomo has recently been the subject of extensive negative news coverage regarding its multiple failed consumer credit products (one of which has been described by industry analysts as a "scam"), widespread consumer complaints about those

Mitchell
Silberberg &
Knupp LLP

20368220.1

2
**COMPLAINT**

products, and numerous related and unrelated lawsuits.[1]  Any public association whatsoever between Prism and Tomo does damage to Prism and to the public.

7.     Tomo's persistent efforts to co-opt and infringe upon a market leader's brand show no sign of ceasing.  Accordingly, Prism has no option but to bring this action to halt Tomo's illegal acts.

## PARTIES

8.     Prism Data Technologies, Inc. is a Delaware corporation, with offices at 9255 Towne Centre Drive, Suite 350, San Diego, California 92121.

9.     Upon information and belief, TomoCredit, Inc. is a Delaware corporation headquartered at 535 Mission Street, San Francisco, California 94105.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over the subject matter of the claims arising under the Lanham Act, 15 U.S.C. § 1051, et seq., pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

11.     Jurisdiction over Tomo is proper because Tomo is headquartered in California.  In addition, upon information and belief, Tomo has marketed to prospective customers, including for services with which Tomo has used the term "CashScore" or "Cash Score" (the "Infringing Marks") in this District.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Tomo is subject to personal jurisdiction in this District and/or because a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

**Prism, Its CASHSCORE® Solution, and the Mark**

13.     Prism and its team have been leaders and innovators in cash flow underwriting for nearly a decade.  The cash flow underwriting space is rapidly evolving and growing, with support

---

[1] Even Tomo's business partners and lenders have sought to distance themselves from the company—according to public filings and recent news reports, Tomo's former lender and credit card issuing bank, as well as the three major national credit bureaus, have all terminated their relationships with Tomo.

Mitchell Silberberg & Knupp LLP

20368220.1

3

**COMPLAINT**

from financial services regulators and growing adoption by large banks and other major lenders. Prism's CashScore® product is a market-leading cash flow underwriting solution that helps financial services providers predict the probability of consumer and small business credit defaults.

14.    The CashScore® product works similarly to a traditional credit score in that it predicts and rank-orders the relative probability of credit default among potential borrowers, but it is based on a borrower's deposit account transaction data, or cash flow data, rather than their credit history.

15.    The CashScore® product provides lenders with a ready-to-use solution to analyze bank account transaction data and leverage cash flow underwriting to make better credit decisions—distilling intensive data structuring, sophisticated feature engineering, and advanced predictive modeling into an easy-to-understand three-digit risk score.  Using Prism's CashScore® product, lenders can instantly analyze the bank account activity of consumers and small businesses to identify sizable populations of borrowers who are more (or less) creditworthy than their credit histories suggest.

16.    The model powering the CashScore® product is trained using large "consortium" datasets, including historical financial data and loan performance history from millions of U.S. consumers across dozens of banks and lenders and billions of dollars in credit originations made over the past decade-plus.

17.    Prism and its formerly affiliated company, Petal Card, Inc. ("Petal"), have been trailblazers in the cash flow underwriting space.  Development of the technology behind the CashScore® offering began in 2016, and Prism and Petal have collectively invested millions of dollars over the years into research and development for the CashScore® product and the technological capabilities that enable it.

18.    The CashScore® product is highly predictive across the consumer risk spectrum as well as the credit product spectrum.  It reliably and consistently outperforms traditional credit scores and custom bureau models on a standalone basis, and it provides even greater predictive power when combined with traditional scores and models.  Prism's CashScore® solution has been

Mitchell
Silberberg &
Knupp LLP

20368220.1

**COMPLAINT**

shown to reduce expected credit losses by as much as 25% and to increase approval rates by up to 30% without impacting loss rates.

19.    By leveraging cash flow underwriting, the CashScore® product enables lenders to (a) assess the creditworthiness of the estimated 76 million U.S. consumers that lack sufficient traditional credit history to qualify for mainstream credit solutions—who are disproportionately likely to be Black or Hispanic, younger, first- or second-generation immigrants, people with disabilities, and survivors of domestic violence—and (b) make better and more informed risk decisions generally.

20.    Prism's CashScore® product is currently used by a wide range of customers, including top credit card issuing banks and fast-growing financial technology companies.  In addition, a number of high-profile financial service companies, including Equifax and Plaid, have publicly announced partnerships with Prism to become licensees of the Mark and make the CashScore® product available to their current and prospective customers.

21.    Prism and its team have also contributed to leading public-interest initiatives and research connected to cash flow underwriting.  These contributions include participation in the U.S. Office of the Comptroller of the Currency's Project REACh, which has focused on incubating new solutions to accelerate financial inclusion, including cash flow underwriting, as well as participation in a groundbreaking empirical study on the consumer benefits of cash flow underwriting conducted by the nonprofit innovation center FinRegLab, which was published in February 2020.

22.    Intending to market its innovative risk score to financial service providers, Petal (a) coined the term "CashScore" and began marketing the product no later than the first calendar quarter of 2020, (b) launched Prism and the CashScore® service more broadly in April 2021, and (c) assigned all of its rights, title and interest in and to the term CashScore® to Prism.

23.    In addition to its trademark rights built through its and its licensees' use, Prism is the owner of U.S. Reg. No. 7,149,656 for CASHSCORE® for "credit scoring services; financial credit scoring services; credit underwriting; financial services, namely, analyzing bank account transactional data, income, assets, and cash flows to predict credit default risk and make

determinations regarding consumer financial status and creditworthiness" in International Class 36, and for "application service provider featuring application programming interface (API) software; application service provider featuring application programming interface (API) software for credit underwriting; application service provider featuring application programming interface (API) software for predicting credit default risk and assessing consumer financial status and creditworthiness; providing temporary use of online non-downloadable software for credit underwriting; providing temporary use of online non-downloadable software for predicting credit default risk and assessing consumer financial status and creditworthiness; providing temporary use of online non-downloadable software for analyzing and evaluating consumer electronic financial records and for accessing, reading, and tracking consumer financial information" in International Class 42 (the "Registration").

24. Prism's trademark application was unopposed, and Prism obtained the Registration on August 29, 2023. The Registration reflects a nationwide priority date of July 19, 2022 and identifies a first use date at least as early as April 27, 2021 for all of the services mentioned in U.S. Reg. No. 7,149,656.

25. Prism was incorporated in September 2021, but its business and the CashScore® product took shape much earlier as part of Petal, which was founded in February 2016.

26. Petal pioneered the use of cash flow underwriting in consumer credit cards, seeking to identify consumers who were creditworthy but lacked traditional credit history.

27. The Petal Card, and Petal's plan to use cash flow underwriting, was announced in September 2017, and the card was first issued to U.S. consumers in October 2018.

28. By no later than the first calendar quarter of 2020, Petal was having commercial discussions with lenders and other potential partners about making its proprietary cash flow underwriting technology available commercially to allow other lenders to use the technology for their own credit underwriting. In these discussions and related written communications, Petal began referring to this technology as its "CashScore" or "Cash Score" product.

Mitchell
Silberberg &
Knupp LLP

20368220.1

6

**COMPLAINT**

29. In April 2021, Petal publicly announced that it would make the "CashScore" solution available to lenders through Prism, which was initially a business unit within Petal. Prism subsequently spun off from Petal and became an independent, standalone business.

**Tomo, Its Business, and Its Troubled Reputation**

30. Upon information and belief, Tomo was founded by Kristy Kim in 2019 and announced its first product, the TomoCard, in August 2019. The TomoCard would purportedly use cash flow underwriting to approve consumers who lacked traditional credit scores—just like the Petal Card before it.

31. Tomo and Ms. Kim hold themselves out as innovators in cash flow underwriting. For example, in a recent video interview in April 2024, Ms. Kim stated about cash flow underwriting that "nobody has done it except Tomo." This and other statements Ms. Kim and Tomo have made over the years are false.

32. By August 2019, when Tomo announced its intention to launch its first product, tens of thousands of U.S. consumers were already using Petal Cards and had benefited from cash flow underwriting and the CashScore® technology. Tomo does not appear to have launched their copy-cat TomoCard product into the market until almost two years later, when it announced "the launch of the TomoCredit Mastercard" in a press release issued on March 18, 2021.

33. But the TomoCard was not long-lived. Although Tomo's website continued to market and entice consumers to apply for the TomoCard as recently as November 2024, Ms. Kim confirmed in a January 2024 affidavit, filed in New York Supreme Court, that the TomoCard business had shuttered in September 2023: "On September 27, 2023, Tomo SPV and TomoCredit ceased extending new credit for the credit card operations."

34. Ms. Kim's affidavit was filed in connection with a lawsuit brought against Tomo by its former lender, Silicon Valley Bank ("SVB"), claiming Tomo had defaulted in numerous ways and on several occasions, including misappropriating funds under its loan facility with SVB. The New York judge overseeing this lawsuit ruled in SVB's favor, awarding a judgment against Tomo for more than $5,000,000. Based on court records, Tomo appears to have paid this obligation in full.

Mitchell
Silberberg &
Knupp LLP

20368220.1

7

**COMPLAINT**

35.    In February 2024, a widely read newsletter in the financial technology space, "Fintech Business Weekly," published a lengthy article documenting Tomo's troubles.  The story called attention to several additional lawsuits facing Tomo, including for: (a) failures to pay hundreds of thousands of dollars to vendors, including Tomo's own trademark attorney; (b) a purported consumer class action lawsuit for spam texting in violation of the Telephone Consumer Protection Act; and (c) a customer lawsuit for failure to furnish accurate credit data to credit bureaus in violation of the Fair Credit Reporting Act.

36.    In addition, and perhaps even more alarming from a reputational perspective, the Fintech Business Weekly article documented a lawsuit filed against Tomo and Ms. Kim by a former Tomo employee.  This lawsuit was based on Tomo's and Ms. Kim's failure to pay an agreed-upon settlement relating to Tomo's and Ms. Kim's alleged sexual harassment of the former employee and retaliation against the former employee for reporting Tomo's and Ms. Kim's alleged illegal business practices.

37.    Against this backdrop of the failing TomoCard, other business and legal troubles, and alleged illegal business activities, Tomo appears to have pivoted to a second product in mid-2023.  This product, called TomoBoost, lured consumers into paying steep fees (which have ranged up to approximately $100 per month) to subscribe to a "credit booster" service through which Tomo would supposedly report credit lines and positive credit history to the three major national credit bureaus—Equifax, Experian, and TransUnion.

38.    Upon information and belief, the reported credit lines and histories that TomoBoost reports are *fictional*.  Tomo appears to have initially formed relationships with the major credit bureaus for the purpose of reporting legitimate credit-related activity of consumers who used the TomoCard, and then misappropriated those relationships in connection with the TomoBoost product to report fictional information intended to manipulate the credit ratings of consumers who have paid Tomo's exorbitant fees.

39.    Based on recent news reports published by Forbes and elsewhere in October 2024, which are described in more detail below, it appears that the three major credit bureaus have cut off Tomo's ability to report credit activity.  This move by the bureaus would make the value that

TomoBoost offers to consumers—i.e., the reporting of fictional credit lines and fictional positive credit history designed to manipulate and boost the credit ratings of paying customers—impossible to deliver.  Nevertheless, Tomo continues to market TomoBoost to consumers on its website.

40.    In addition to being business failures, the TomoCard and TomoBoost have failed their customers.  As of December 4, 2024, Tomo's public Business Profile page on the Better Business Bureau's website indicates that: (a) Tomo has a BBB Rating & Accreditation of "F"; (b) the company has had 468 customer complaints in just the last 12 months; and (c) Tomo's customer rating based on 337 customer reviews is 1.97 stars out of 5.  Similarly as of December 4, 2024, the public Trustpilot rating for TomoBoost is 1.3 stars out of 5 based on 79 reviews, with 95% of reviews grading it with 1 star.

41.    Perhaps more alarming, the public complaint database maintained by the U.S. Consumer Financial Protection Bureau (the "CFPB") shows 169 consumer complaints filed with the CFPB about Tomo during the 10-month period from February 1, 2024 (the earliest date from which data is available) through December 3, 2024.

42.    In the midst of this flood of consumer complaints, Tomo announced its third product, the TomoScore, in March 2024.

43.    Despite the fact that this announcement came years after Prism's CashScore® product had developed extensive attention in the fintech industry, Tomo's announcement falsely referred to the TomoScore as "a first-of-its-kind fintech product," describing it as "an innovative cash flow-based credit score that provides lenders a risk-free way to identify high-quality borrowers with limited or no credit history. . . . by evaluating real-time cash flow attributes that other credit rating methods overlook."

44.    But Prism has not overlooked these methods: Prism pioneered them.  Prism's and Petal's leadership in the cash flow underwriting space has been well known, and well-documented in news reports, for years.  Tomo and Ms. Kim have falsely asserted time and again that they invented cash flow underwriting despite knowing they did not.

Mitchell Silberberg & Knupp LLP

20368220.1

9

**COMPLAINT**

45. Although the press release announcing the TomoScore was more than 580 words in length, this formal launch announcement did not include the term "CashScore" or any other derivative of the Mark—a conspicuous absence given Tomo's spurious claims that it originated the use of the term.

46. Despite falsely claiming credit for inventing cash flow underwriting, Tomo at least marketed its score product under its own brand name for a couple of months. Unfortunately, that would soon change with Tomo's latest scheme—to misappropriate and usurp Prism's strong reputation in the cash flow underwriting space.

**Tomo's Adoption of the Mark to Market Its Products**

47. While Prism (and before it, Petal) had marketed its products under the name "CashScore" publicly for years already, the Mark was featured prominently in fintech industry publications and events in the Spring of 2024.

48. In May 2024, "Fintech Takes," another widely read newsletter in the financial technology sector, published a long-form essay entitled "Everything You Ever Wanted to Know About Cash Flow Underwriting But Were Afraid to Ask." The essay featured the CashScore® product and discussed performance data demonstrating the efficacy of Prism's CashScore® solution and its ability to add predictive power to credit decisions beyond the use of traditional credit scores. The essay was emailed to the full list of subscribers of Fintech Takes and read by thousands of recipients in the financial services industry.

49. On June 18, 2024, in its annual client conference titled Effects, which receives significant media and customer attention in the financial technology space, leading financial technology platform Plaid highlighted that it had partnered with Prism to offer the CashScore® product to clients utilizing Plaid's new Consumer Report product offering.

50. Shortly after this positive publicity, Prism observed Tomo beginning to infringe the Mark. In posts on Tomo's blog and LinkedIn account, where Tomo appeared to be referring to its TomoScore product, Tomo instead referred to its "groundbreaking" and "transformative" "TomoCredit Cash Score" "introduced" "[i]n 2024." In a product image shared as part of the

LinkedIn post, Tomo included what appeared to be a dashboard where a user could view their "Cash Score."

51.    On June 24, 2024, Prism wrote to Tomo and Ms. Kim to put them on notice of Prism's rights and to request that Tomo immediately cease and desist use of the Mark.  Ms. Kim rapidly acknowledged receipt of the cease-and-desist letter that same day by replying and adding Tomo's counsel to the applicable email chain.

52.    Less than 24 hours later—notwithstanding Ms. Kim's receipt and acknowledgment of Prism's letter—Ms. Kim knowingly and willfully doubled down on her and Tomo's infringing use of the Mark with a LinkedIn post on June 25, 2024, in which Ms. Kim twice referred to the "TomoScore (CashScore)."  Notably, this infringing use was the first use observed by Prism where Tomo or Ms. Kim had removed the space between "Cash" and "Score" to even more closely mirror the Mark (in the specific form notified to them in Prism's cease-and-desist letter).  Prism rapidly notified Tomo's counsel of this bad-faith infringement.

53.    Tomo responded to Prism's cease-and-desist letter on July 2, 2024.  In its response, Tomo falsely claimed that (a) "CashScore" is a widely used term for the analysis that Tomo claimed to have innovated, (b) Tomo's cash flow rating service was not proximate to Prism's cash flow rating services, and (c) it was under no obligation to take any steps without extensive documented proof of actual confusion.  Tomo further proposed a coexistence agreement that would ostensibly allow two direct competitors to use the same trademark for the same category of services.

54.    In addition, Tomo decided to concoct "facts" in its response letter.  In particular, despite stating repeatedly on its website and in LinkedIn posts that the TomoScore was "introduced" in 2024, Tomo inexplicably claimed that it had ongoing and consistent use of the "CashScore" term as far back as 2018, before Tomo was even founded.

55.    This claim was a lie in all respects.  After extensive searching, the only instances Prism could find of Tomo—or anyone, including more-established competitors of Prism—using "CashScore" or "Cash Score" were Tomo's uses in June 2024 that were the subject of Prism's cease-and-desist letter.

56. Nevertheless, on July 12, 2024, Prism requested evidence of Tomo's purported prior use of "CashScore" or "Cash Score." Presumably, if the purported prior use existed as Tomo represented to Prism, then Tomo could easily and quickly produce such evidence to Prism.

57. However, it ultimately took Tomo and its counsel *more than six additional weeks*—filled with regular follow-up requests from Prism and continuous excuses for delay from Tomo's counsel—before they could provide any material to Prism to support their claims. And what they finally provided was fabricated in an ineffectual attempt to defraud Prism and usurp its rights in the Mark.

58. On August 28, 2024, Tomo's counsel provided a link to a blog post that purportedly showed use of "the 'Cashscore' mark at least as early as 2019." The following day, Tomo's counsel sent a very small handful of redundant blog and social media posts, mentioning "we have evidence that traces Tomo's use back to 2018"—despite the fact that Tomo was not even incorporated until 2019.[2]

59. Upon review of the material, it became immediately clear to Prism that Tomo had been using the previous weeks to doctor its historical blog posts, on both its own website and in certain cases on its blog posts hosted through Medium as well. But Tomo did not take enough time or care to cover its tracks.

60. For example, a search in the publicly available source code data for all of the blog posts hosted on Tomo's website that were originally published prior to Prism's cease-and-desist letter showed that two, and only two, blog posts had been modified on August 15, 2024—approximately six weeks after Prism's cease-and-desist letter and less than two weeks before Tomo provided its purported "proof" of prior use. An example of this source code data, as it relates to a blog post originally published on Tomo's website on August 18, 2019 (the "2019 Post"), is shown below:

```
<meta property="article:published_time" content="2019-08-18T20:57:38+00:00" />
<meta property="article:modified_time" content="2024-08-15T05:15:57+00:00" />
```

---

[2] The California Secretary of State's records confirm that TomoCredit, Inc. was not registered as a business until August 29, 2019.

Mitchell Silberberg & Knupp LLP

20368220.1

12

**COMPLAINT**

It is no coincidence that these two blog posts, being the only Tomo blog posts hosted on Tomo's website that were modified after Prism's cease-and-desist letter, are the only blog posts (prior to the June 2024 blog posts that were the subject of Prism's cease-and-desist letter) hosted on Tomo's website that currently (to Prism's knowledge) contain the terms "CashScore" or "Cash Score."[3]

61.     More glaringly, the original versions of the posts identified by Tomo to Prism as containing prior use of the Mark were captured by the Internet Archive's "Wayback Machine" in 2020 and 2024, prior to Prism's cease-and-desist letter, showing clearly that the original posts did not contain any references to "CashScore," "Cash Score" or any other derivative of the Mark.

62.     A comparison of multiple versions of the 2019 Post, which appears to have originally been entitled Welcome to TomoCredit, between the copy supplied by Tomo on August 28, 2024, on the one hand, and versions captured by the Wayback Machine as of November 8, 2020 and June 14, 2024, on the other hand, shows critical edits that were made by Tomo subsequent to June 14, 2024 to fabricate evidence of prior use of the Mark.  The added material is visible in the red boxes below:

---

[3] The sixteen subsequent blog posts published after the 2019 Post (from October 3, 2019 to November 19, 2020), and the next 40, were all modified on February 21, 2024, with one exception: other than the post noted above, the only other post referencing the Infringing Mark, posted on November 25, 2020, also was last modified on August 15, 2024.

The August 18, 2019 Post, as supplied by Tomo on August 28, 2024:



The August 18, 2019 Post, as captured by the Wayback Machine as of November 8, 2020 and June 14, 2024:

**COMPLAINT**

Mitchell
Silberberg &
Knupp LLP

20368220.1

63.     The language captured in the red boxes in the first snippet above, which was supplied by Tomo—indeed, the only language in any version of the 2019 Post containing the Infringing Marks—was added subsequent to June 14, 2024, evidently on August 15, 2024, *after* Tomo had received Prism's cease-and-desist letter.

64.     A comparison of versions of another post identified to Prism by Tomo, entitled *How Your Parent's [sic] Financial Attitudes Are Impacting You*, originally published on July 3, 2021 (the "2021 Post"), shows additional evidence of Tomo's attempted fraud on Prism relating to the Mark.

65.     The copy of the 2021 Post supplied by Tomo on August 28, 2024, which was extracted from a version of the 2021 Post hosted on Medium, differs from both (1) the version of the 2021 Post hosted on Tomo's own website at the time and captured by Prism on August 29, 2024 and (2) a version of the 2021 Post captured by the Wayback Machine as of June 4, 2021:

Last paragraph of the July 3, 2021 Post, as supplied by Tomo on August 28, 2024:

The relationships between parental financial knowledge and attitude are numerous, but the important thing is acknowledging them and taking the time to reflect on your own situation. Your parents may have been too frugal, leading you to overspend in an effort to overcompensate. They may have been careless with family finances and not balanced needs with wants leading you to live above your means as well. Whatever your situation, make sure to take a step back and analyze your financial history and its impact on your life. This process is not about pointing blame but more about understanding who inspired your amazing money habits and also finding holes that need filling. Thankfully, we do have many options for filling in those gaps. You could learn about personal finance through websites such as Cashcourse, Khan Academy, or Investopedia. You could even watch videos on YouTube, Instagram, or even TikTok! Get to learning in any way that fits your needs (and attention span) so we can continue breaking generational cycles and setting our own. The simple way to start is understanding your "CashScore" — just like credit score, cash score is a great indicator of your overall financial health. It is important to understand your daily, weekly, monthly cash movements so you can manage your spending without always feeling stressed. I remember my parents struggling to make ends meet or fighting about money. I wish my parents had smart products like Tomo so they are more confident about their money. Hope we can all learn and teach our kids how to manage their CashScore.

Last paragraph of the July 3, 2021 Post, as captured (1) from Tomo's website by Prism on August 29, 2024 and (2) by the Wayback Machine as of June 4, 2021:

> The relationships between parental financial knowledge and attitude are numerous, but the important thing is acknowledging them and taking the time to reflect on your own situation. Your parents may have been too frugal, leading you to overspend in an effort to overcompensate. They may have been careless with family finances and not balanced needs with wants leading you to live above your means as well. Whatever your situation, make sure to take a step back and analyze your financial history and its impact on your life. This process is not about pointing blame but more about understanding who inspired your amazing money habits and also finding holes that need filling. Thankfully, we do have many options for filling in those gaps. You could learn about personal finance through websites such as Cashcourse, Khan Academy, or Investopedia. You could even watch videos on YouTube, Instagram, or even TikTok! Get to learning in any way that fits your needs (and attention span) so we can continue breaking generational cycles and setting our own.

66. Similar to the 2019 Post, the language contained in the red box in the first snippet above, which was supplied by Tomo—again, the only language in any version of the 2021 Post containing the Infringing Marks—was evidently added (only to the version hosted on Medium) *after* Tomo had received Prism's cease-and-desist letter.

67. Beyond the snippets described above, other purported evidence of prior use supplied by Tomo was nonsensical, appeared to be doctored, was not findable online, or did not actually represent use that was prior to Prism's.

68. Alarmed by Tomo's blatant misrepresentations and fabrications, Prism's counsel contacted Tomo's counsel, provided an example of these discrepancies, and requested a phone call to discuss the seriousness of Tomo's activities.

69. The parties spoke on September 10, 2024. By this time, Tomo's former outside counsel had become Tomo's in-house counsel, and Tomo had hired new outside counsel to represent it in this matter. Nevertheless, Tomo's now-in-house counsel opened the discussion with an incoherent rant about his law license and his marriage, inexplicably restating that he still had no idea what the problem was with the documentation he had supplied, and claiming that

Mitchell
Silberberg &
Knupp LLP

20368220.1

16

**COMPLAINT**

Medium had something to do with the issue.  It remains unclear to Prism whether—and to what extent—Tomo's now-in-house counsel may have been involved with, or had knowledge of, Tomo's attempted fraud on Prism.

70.    Tomo's new outside counsel also joined the call and claimed that he had additional evidence that he would send to Prism's counsel.  He further recited basic principles of trademark law to Prism's counsel and suggested that if she persisted with the claim then Prism would fire her.  Ignoring these deflections, Prism's counsel encouraged him to question his client and indicated that, in addition to sending the additional evidence he purported to have, he should also closely review the discrepancies identified by Prism in the previous purported evidence supplied by his client and determine whether there was actual prior, consistent use by Tomo of "Cash Score" or "CashScore."

71.    None of Tomo, its now-in-house counsel or its new outside counsel have provided any response, information or other follow-up subsequent to the September 10, 2024 call.

72.    For several weeks following the call, Tomo also seemed to have ceased infringing the Mark, so Prism fairly assumed that Tomo's new outside counsel had advised his client to walk away from the Mark, cease its problematic attempts to fabricate evidence, and halt any further infringing usage.

**Tomo's Increasing Troubles and Deteriorating Reputation**

73.    As described above, Tomo's reputation was already tarnished before it began its attempts to usurp Prism's rights in the Mark in June 2024; this was a major concern to Prism when it sent its initial cease-and-desist letter to Tomo.  Prism enjoys a strong reputation as an upstanding leader in the financial technology and cash flow underwriting spaces, so any risk of confusion between Tomo and its products, on the one hand, and Prism and its products, on the other hand, or any potential association between Tomo and Prism, poses substantial harm to Prism.

74.    During the period since Prism's initial letter, however, Prism has observed an increasingly concerning spate of extremely negative press coverage about Tomo and its executives.  Although this coverage, like prior Tomo coverage, did not relate in any way to Prism or Prism's dispute with Tomo, Prism has viewed this coverage with growing alarm given Tomo's

Mitchell
Silberberg &
Knupp LLP

20368220.1

**COMPLAINT**

willful and persistent attempts to confuse the public and associate itself and its products with Prism and Prism's market-leading CashScore® solution.

75. On October 15, 2024, an article published by Forbes profiled Tomo and a Tomo customer's "bizarre and frustrating" experience trying to cancel her TomoBoost subscription, including having to block Tomo's charges through her credit card company and contact the Michigan attorney general.

76. Over the ensuing week, the negative news appeared to spiral quickly for Tomo. On October 18 and 19, 2024, news of SVB's successful $5,000,000+ lawsuit against Tomo was covered by Fintech Business Weekly and Fintech Takes and published to tens of thousands of followers and subscribers in the financial services space. In addition to the failure of the TomoCard, the writers discussed Tomo's dubious TomoBoost product. The coverage is perhaps best summed up by the following quote: "TomoCredit is a scam."

77. One of the articles also noted that Tomo "claimed to be working on a cash flow underwriting score for lenders to use, which was a ridiculous claim on its face since there is zero evidence that Tomo has ever built any actual product capabilities in that area." This comment was especially troubling to Prism, as it clearly highlighted the risk of Tomo's willful efforts to infringe the Mark, confuse the public, and associate itself with Prism and the CashScore® product.

78. Seeing this wave of coverage from leading financial technology journalists—which is only summarized and not fully cataloged above—was increasingly troubling for Prism, knowing that Tomo continued to infringe the Mark while all of this was happening, leaving Prism exposed to potential confusion between Prism and Tomo. But the coverage continued to worsen.

79. On October 25, 2024, another article published by Forbes reported that the three major credit bureaus—Equifax, Experian, and TransUnion—had cut off Tomo's ability to report credit information, "undercut[ing] Tomo's claim that it reports to the bureaus and mean[ing] its credit-boosting service [TomoBoost] can't work as it says it does."

**Tomo's Revived Willful Infringement of Prism's Trademark**

80. While Prism observed the steady degradation of Tomo's reputation throughout the month of October with increasing alarm, Prism took some solace in the fact that Tomo had not, at

Mitchell
Silberberg &
Knupp LLP

20368220.1

18

**COMPLAINT**

least to Prism's knowledge, produced new content infringing the Mark since June. Tomo appeared to have been counseled not to persist with its specious claim that it was the senior user of the Mark.

81. To Prism's chagrin, however, on October 29, 2024, Tomo issued a press release infringing the Mark again, stating that it "continues to expand its proprietary CashScore, known as TomoScore."

82. In light of this latest willful attempt to usurp Prism's rights in the Mark—and to confuse and defraud the public by creating a false association between the "scam" that is Tomo and its products, on the one hand, and Prism and the market-leading CashScore, on the other hand—Prism has no choice but to seek relief in this Court.

**FIRST CLAIM FOR RELIEF**

**(Trademark Infringement and Counterfeiting in Violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1))**

83. Prism repeats and realleges the allegations set forth above as if fully set forth herein.

84. Prism owns valid and protectable trademark rights in the mark CASHSCORE®, including all common law rights, and all rights, title, and interest in and to the Registration.

85. By virtue of Prism's Registration, the CASHSCORE® trademark enjoys a presumption of distinctiveness and validity, applicable nationwide, as of July 19, 2022.

86. Further, consumers readily identify products and services offered under or in conjunction with the Mark as being trustworthy, high-quality, and emanating exclusively from, and being sponsored and approved by, Prism.

87. By using the terms "CashScore" and "Cash Score," Tomo has used terms that are the same or similar in appearance, sound, meaning, and overall impression to those created by Prism's CASHSCORE® trademark.

88. Tomo has used the Infringing Marks in conjunction with products and services that Tomo represents are the same, related to, or complementary with the products and services that

Prism offers under its registered Mark, and Tomo targets the same type of customers that Prism targets.

89.     Tomo has made such use of the registered Mark with full knowledge of Prism's Mark, and Tomo intends to free-ride on the goodwill that Prism has built up in its Mark.

90.     By virtue of Tomo's willful use of trademarks that are identical or highly similar to Prism's registered Mark, Tomo is likely to cause confusion and/or mistake among the relevant consuming public, leading the public to believe that Tomo's offerings originate from Prism or are equivalent to Prism's, which they are not, or that Prism has sponsored, approved, licensed, or otherwise associated itself with Tomo or the services offered under the Infringing Marks, when it has not.

91.     Tomo has infringed and continues to infringe Prism's registered CASHSCORE® Mark with full knowledge of Prism's exclusive rights in its Mark, and with deliberate intent to benefit from the goodwill associated with the CASHSCORE® Mark.

92.     Tomo's actions constitute an infringement of Prism's rights in the CASHSCORE® Mark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114(1).

93.     Upon information and belief, Tomo has made and will continue to make substantial profits to which Tomo is not entitled in law or in equity as a result of its infringement and counterfeiting.

94.     Tomo's infringing conduct has caused and, unless restrained by this Court, will continue to cause, irreparable harm, loss, and injury to Prism, for which Prism has no adequate remedy at law.

### SECOND CLAIM FOR RELIEF

**(Unfair Competition and False Designation of Origin in Violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)))**

95.     Prism repeats and realleges the allegations set forth above as if fully set forth herein.

96.     Except for Tomo's recent unlawful use, the term "CashScore" for cash flow underwriting and other related services has been exclusively used by Prism for almost four years.

Mitchell Silberberg & Knupp LLP

20368220.1

20

**COMPLAINT**

As a result, the relevant public has come to know "CashScore" to be exclusively associated with goods and services offered by Prism.

97.     Tomo's advertising, promoting for sale, selling, and offering for sale of services under or in conjunction with the Infringing Marks, which are identical and/or highly similar to Prism's preexisting Mark, causes confusion and mistake, deceives and misleads the purchasing public, trades on Prism's high-quality reputation, and improperly appropriates to Tomo the valuable trademark rights of Prism.

98.     By making unauthorized use, in interstate commerce, of the Infringing Marks, Tomo has used a false designation of origin—*i.e.*, the Infringing Marks—that is likely to cause confusion, or to cause mistake or to deceive, as to the affiliation, connection, or association of Tomo with Prism, and as to the origin, sponsorship, or approval of Tomo's infringing products and services by Prism, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

99.     Further, by capitalizing on the hard-earned goodwill of Prism and its CASHSCORE® brand, Tomo's activities constitute unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

100.     Tomo's wrongful acts as described above will continue unless enjoined by this Court.

101.     Tomo's acts have caused and will continue to cause irreparable injury to Prism. Prism has no adequate remedy at law and is thus damaged in an amount not yet determined.

**THIRD CLAIM FOR RELIEF**

**(Unfair Competition in Violation Under California Business and Professions Code § 17200)**

102.     Prism repeats and realleges the allegations set forth above as if fully set forth herein.

103.     Tomo's adoption of a trademark that is identical to Prism's CASHSCORE® Mark, which upon information and belief was done for purposes of unlawfully and unfairly competing with Prism by causing the public to believe that Tomo's services are affiliated with Prism or

Mitchell
Silberberg &
Knupp LLP

20368220.1

21
**COMPLAINT**

equivalent to Prism's, when they are not, constitutes an unlawful and unfair business practice in violation of Cal. Bus. & Prof. Code § 17200.

104. Tomo's wrongful acts as described above will continue unless enjoined by this Court.

105. Tomo's acts have caused and will continue to cause irreparable injury to Prism. Prism has no adequate remedy at law and is thus damaged in an amount not yet determined.

## FOURTH CLAIM FOR RELIEF

### (Common Law Unfair Competition)

106. Prism repeats and realleges the allegations set forth above as if fully set forth herein.

107. Upon information and belief, Tomo adopted and used the term "CashScore" with the intention to defraud the public for purposes of Tomo's own commercial gain, even where Tomo has been besieged with consumer and industry complaints and observations about Tomo's untrustworthiness.

108. Tomo's use of Prism's CASHSCORE Mark will result and has resulted in injury to and appropriation of Prism's business via Tomo's knowing and intentional passing off of its business being associated in some way with Prism and its CASHSCORE-branded business.

109. Accordingly, Tomo's activities as alleged above constitute unfair competition under the common law of the State of California.

110. Tomo's wrongful acts as described above will continue unless enjoined by this Court.

111. Tomo's acts have caused and will continue to cause irreparable injury to Prism. Prism has no adequate remedy at law and is thus damaged in an amount not yet determined.

## JURY TRIAL DEMAND

Prism requests a trial by jury on all issues so triable pursuant to Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Prism respectfully demands:

Mitchell
Silberberg &
Knupp LLP

20368220.1

22

**COMPLAINT**

1. That the Court find that Tomo has engaged in trademark infringement, trademark counterfeiting, false designation of origin, and unfair competition under federal, state, and common law;

2. That the Court issue an injunction providing that, pursuant to 15 U.S.C. § 1116(a), Tomo and its agents, employees, representatives, partners, joint venturers, and/or anyone acting on behalf of or in concert with Tomo, jointly and severally, be enjoined through the world during the pendency of this action and permanently thereafter from:

(a) Using any reproduction, counterfeit, copy, or colorable imitation of Prism's CASHSCORE® Mark to identify any services not authorized by Prism;

(b) Engaging in any course of conduct likely to cause confusion, deception, or mistake, or to injure Prism's business reputation;

(c) Using a false description or representation including words, symbols, or artwork tending falsely to describe or represent Tomo's unauthorized services as being those of Prism or sponsored by or associated with Prism and from offering such services in commerce;

(d) Further infringing the CASHSCORE® Mark by selling, marketing, offering for sale, advertising, promoting, or otherwise offering of any services not authorized by Prism under any simulation, reproduction, counterfeit, copy, or colorable imitation of the CASHSCORE® Mark;

(e) Using any simulation, reproduction, counterfeit, copy or colorable imitation of the CASHSCORE® Mark in connection with the promotion, advertisement, sale, offering for sale, or offering of any unauthorized services in such fashion as to relate or connect, or tend to relate or connect, such services in any way to Prism, or to any services sold, offered, sponsored, or approved by, or connected with Prism;

(f) Making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any services offered or sold by Tomo are in any manner associated or connected with Prism, or are sold, offered, licensed, sponsored, approved, or authorized by Prism;

(g)     Secreting, destroying, altering, removing, or otherwise dealing with any books or records that contain any information relating to the selling, marketing, offering for sale, advertising, or promoting of all unauthorized services offered under the Infringing Marks; and

(h)     Effecting assignments or transfers, forming new entities or associations or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in subparagraphs (a) through (h).

3.     That the Court issue an order requiring an accounting of all profits obtained by Tomo from Tomo's offer of services under the Infringing Marks and an order that Tomo hold all such profits in a constructive trust for the benefit of Prism;

4.     That the Court issue an order requiring Tomo to pay Prism (i) all such actual damages and profits attributable to the infringements of the CASHSCORE® Mark by Tomo and those acting in concert with it in an amount to be proven at trial, trebled, pursuant to 15 U.S.C. § 1117(a), or (ii) in the alternative, at Prism's election before trial, statutory damages pursuant to 15 U.S.C. § 1117(c) of up to $2,000,000.00 per type of goods or services sold, offered for sale, or distributed by or in concert with Tomo;

5.     That the Court issue an order requiring Tomo to pay Prism restitution in an amount to be determined at trial under Cal. Bus. & Prof. Code § 17200, as well as additional monetary penalties as may be available under common law;

6.     That the Court issue an order requiring Tomo to pay Prism its costs and reasonable attorney's fees, and prejudgment interest where available;

7.     That an order be issued, pursuant to 15 U.S.C. § 1118, directing Tomo to deliver up for preservation, storage, and/or destruction to Prism or its designated agent all unauthorized software or other materials relating to the products and services offered in connection with the Infringing Marks, and all marketing, advertising, and promotional materials in its possession or under its control bearing the Infringing Marks, or any simulation, reproduction, counterfeit, copy, or colorable imitation of the CASHSCORE® Mark, and all articles by means of which such infringement occurred; and

Mitchell
Silberberg &
Knupp LLP

20368220.1

24

**COMPLAINT**

8.    That the Court award such other and further relief as the Court deems just and proper.


DATED: DECEMBER 10, 2024                RESPECTFULLY SUBMITTED,

                                        ELEANOR M. LACKMAN
                                        MITCHELL SILBERBERG & KNUPP LLP


                                        By:/s/ Eleanor M. Lackman
                                            Eleanor M. Lackman
                                            Attorneys for Prism Data Technologies, Inc.

Mitchell
Silberberg &
Knupp LLP

20368220.1

25

**COMPLAINT**